
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 13, 2016 Session

**STATE OF TENNESSEE v. PETR POMPA**

**Appeal from the Criminal Court for Davidson County
No. 2014-B-1385    Monte Watkins, Judge**

_____

**No. M2016-00193-CCA-R3-CD**

_____

The Defendant, Petr Pompa, was convicted by a Davidson County jury of two counts of
sexual battery by an authority figure and two counts of statutory rape by an authority
figure.  On appeal, the Defendant argues that (1) the trial court erred in allowing
inadmissible opinion, character, and hearsay testimony at trial; (2) the trial court erred in
excluding evidence of the victim's motive to fabricate the allegations against the
Defendant; (3) the trial court erred in allowing the victim to remain in the courtroom
following her testimony; (4) the trial court erred in denying the Defendant's motion for
judgment of acquittal as to counts five and six; and (5) the Defendant's sentence was
unlawful.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY
THOMAS, JR. and J. ROSS DYER, JJ., joined.

Brent Horst, Nashville, Tennessee, for the Defendant-Appellant, Petr Pompa.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel;
Glenn Funk, District Attorney General; and Alyssa Hennig, Assistant District Attorney
General, for the Appellee, State of Tennessee.

**OPINION**

On May 27, 2014, the Davidson County Grand Jury indicted the Defendant for
sexual battery by an authority figure in counts one and two, statutory rape by an authority
figure in counts three and four, and rape in counts five and six.  The offenses were
committed against the Defendant's minor stepdaughter, V.G.[1]

---

[1]It is the policy of this court to refer to minor victims and their family members by their initials.

**Trial.** The victim's mother testified that she met the Defendant in 1994 when they were both living in the Czech Republic and that they dated for a couple months. The Defendant later moved to the United States, and the victim's mother and the Defendant remained friends. The victim was born in 1995 and her father, who was not identified at trial, still lives in the Czech Republic. The victim's mother and the victim came to the United States in 1999, and they stayed in California with the Defendant. A few months later, the Defendant and the victim's mother were engaged, married, and then had a daughter together, G.P., in 2002. Eventually, the Defendant lost his job and decided to move to Tennessee, where he had a friend who could hire him as a carpenter. The victim's mother decided to stay in California with her two daughters because she was in the middle of her green card application process and did not want to remove her daughters from school. After the Defendant moved to Tennessee, the victim made a disclosure to her mother that something inappropriate had happened with the Defendant, and her mother contacted the authorities. The victim's mother cut off all contact with the Defendant.

In 2010, the victim's mother began having financial difficulties in California and contacted the Defendant. The Defendant offered for the victim's mother and her daughters to move to Tennessee and live with him, and she eventually accepted the Defendant's offer. The victim's mother stated that she and the Defendant had agreed to "be separate as much as possible." When they moved to Nashville, the Defendant, the victim's mother, and her daughters shared a house. The victim's mother testified that she usually shared a bedroom with her daughters, although occasionally she would sleep on the sofa, and that the Defendant had his own room. Although the victim's mother was concerned about her daughters' safety living with the Defendant, she testified that she "didn't see any other option[s]." At the time of the move, the victim was in the ninth grade. The victim's mother and the Defendant began divorce proceedings in April 2013, and were officially divorced at the time of trial.

The victim, who was twenty years old at the time of trial, testified that she was born in the Czech Republic on March 5, 1995. She came to the United States when she was four years old to live in California with her mother and her stepfather, the Defendant. She testified that she was living in Nashville in January 2013, and was seventeen years old and a senior in high school.

One Saturday in January 2013, the victim was at home with her sister and the Defendant while her mother was at work. The victim testified that she was in the Defendant's bedroom with the Defendant while her sister was watching television in another room. The victim and the Defendant were talking while the Defendant sat in a chair at his desk and the victim sat nearby on his bed. The victim got up to leave and gave the Defendant a hug while he was sitting in his chair. The Defendant then placed

his hand on the victim's breast. The victim testified that "I think he caught himself at this point and he asked what am I doing" and that, "[f]or some reason, I couldn't say anything." The Defendant then placed his hand underneath the victim's shirt and fondled her breast. In Czech, he asked "'Moci[?],'" which means, "'Can I[?].'" Again, the victim testified that she "couldn't say anything." When asked why she could not say anything, the victim explained that "It felt like I wasn't -- I honestly don't know. But it left [sic] like my senses were shut off and I could still see, I could still hear, but I couldn't, I was like I [sic] stuck inside."

The Defendant then removed the victim's shirt and locked his bedroom door. He finished undressing the victim and laid her down on the bed. The victim testified that he then "put his tongue into my vagina, and he put his finger or two fingers into my anus." The victim recalled that the Defendant was kneeling on the floor by the bed and then got up, and she thought he was trying to kiss her. The victim then jumped off the bed, grabbed her clothes, dressed herself, and ran out of the Defendant's room and into the bathroom where she immediately took a shower.

The victim testified that, while she was in the shower, the Defendant came into the bathroom and told her that he was worried she would "report him." The victim told the Defendant that she would not report him. The victim testified that, "[a]t the time, he was my stepdad and I didn't imagine putting my family member in jail." The Defendant remained in the bathroom when the victim got out of the shower and then asked or told her "did you like it" or "I knew you liked it." The victim responded that she did not.

The victim maintained that she did not consent to the Defendant's actions. She testified that he did not threaten her during the incident, but that he had told her in the past that "if I knew someone was trying to rape me . . . it would be best to not fight back and not to, not to try to resist because if [sic] something worse could happen and you could end up dead or worse." The victim also recalled that when she was sitting in the Defendant's room with the Defendant he offered her some liquor and she "consumed between a sip and less than a cup." The victim did not tell anyone in her family what happened, but she told a friend from California because he was one of her "oldest friends," and she did not want to report the incident yet because she "didn't know what the consequences would be."

The following Friday, the victim told a friend from school, S.B., what happened. The victim identified text messages she sent to S.B. on January 17 and 18, 2013, and copies of the messages were introduced at trial. The victim texted S.B. and told him that "it happened again." The victim testified that S.B. "knew my stepdad had done something to me previous before this" and that it had occurred in California when she was thirteen or fourteen years old.

- 3 -

Regarding the previous abuse in California, the victim explained that her stepfather was "roughhousing and wrestling on the bed, on the carpet" with her and "occasionally he would touch my breast and touch in the pubic area." The victim testified that "[i]t was mostly over my clothes, but there were some moments when it was skin on skin." The victim recalled at least four separate times that the Defendant inappropriately touched her while they were in California. The victim did not tell anyone because she thought it was "normal" and that "this is just what parents are supposed to do when they're playing with their kids." The victim recalled that she was uncomfortable with the touching and would scream, bite, and scratch the Defendant to get away from him, but that it rarely worked. The victim explained that she eventually told her mother about the Defendant's actions after he moved to Tennessee.

The victim told S.B. that she was "drunk" and "half-conscious" when the abuse took place. However, the victim testified that she was not actually drunk or unconscious. She explained that "I think I was, I was still shocked as to why I didn't leave, why I let it happen, and I was trying to figure out why I hadn't left. I also was ashamed. I couldn't bring myself to text that I just stayed there and didn't do anything." S.B. told the victim to call the police and that, if she did not, he would. The victim testified that she needed to tell someone what happened but did not want to report the Defendant yet because "[the Defendant] was still [her] stepdad and [she] didn't want to break up the family." The victim asked S.B. not to contact the police and tried to convince him that she was alright, but S.B. reported the incident.

Following S.B.'s report to the police, the school resource officer at the victim's school, Officer Turner, removed the victim from class and took her to his office. Officer Turner asked the victim about the incident, and the victim "tried to reassure him that nothing was wrong, that whatever I was crying about was something else." The victim acknowledged that it is possible she told Officer Turner "it's a boy thing" and that she was still trying to protect the Defendant at that time. The victim testified that she felt intimidated by Officer Turner's questioning.

Next, Officer Turner took the victim to see the guidance counselor, April Gung. The victim testified that "[Gung] opened the door [to her office] and stood there with her arms outstretched, and I hugged her and I broke down and cried." The victim then told Gung what the Defendant had done to her. The victim explained that it was easier for her to tell Gung than Officer Turner "because she was female and I knew her better."

The victim testified that, aside from the sexual assaults, the Defendant was a good father. When asked whether the Defendant had conversations with the victim about "sexual activities in general" the victim stated that "[the Defendant] would ask about how

far I had gone with anyone I was, anyone I had a crush on, anyone I was thinking of dating." The victim also testified that, about a week prior to the allegation, she and her boyfriend had ended their relationship. The victim testified that she was upset and depressed about the break-up.

On cross-examination, the victim agreed that she had felt no fear of physical harm from the Defendant and that he did not physically force her. The victim also acknowledged that, a week after the rape, she stated that the Defendant never meant to rape her. The victim disagreed that the Defendant was a friend and testified that he was "a parental figure." The victim acknowledged that it was possible the Defendant had attempted to tell her not to see her ex-boyfriend.

S.B. testified that he previously attended high school with the victim and that they were classmates and good friends. He identified the previously introduced text messages between himself and the victim and testified that he spoke with the victim on the phone after they were texting and that "[s]he seemed very scared, very almost frantic." S.B. confirmed that he reported what the victim told him to the police.

Officer Steve Turner with the Metro Davidson County Police Department testified that he was the school resource officer at the victim's high school in January 2013. During that time, Officer Turner received a phone call from the Nashville Police Department dispatcher who said a former student, S.B., had called. Officer Turner spoke with S.B. who read Officer Turner the text messages that he received from the victim. Officer Turner then called the victim to his office. The victim told Officer Turner that she was "having some problems" but would not give him any details. Officer Turner testified that the victim said it was a "boy thing."

April Gung testified that she was a school counselor at the victim's high school during January 2013. Gung spoke with the victim on January 18, 2013, in her office and testified that the victim was upset, stressed, and crying. Gung recalled that she knew the victim and that she was generally calm and reserved and "not one to be attention seeking." Gung testified that the victim made a disclosure to her about what had happened. The victim was concerned about how the disclosure would affect her family, particularly her younger sister. After the conversation, Gung reported the disclosure to the Department of Children's Services.

Detective Jason Mayo testified that he was assigned to the Sex Crimes Division of the Metro Nashville Police Department. Detective Mayo received information about the victim's case and went to her high school to interview her. The victim told Detective Mayo about the Defendant's actions. Detective Mayo recalled that the victim was very

quiet and kept her head down while she spoke and that she was "obviously upset" and had been crying.

On cross-examination, Detective Mayo testified that he spoke with Officer Turner before he spoke with the victim. Officer Turner informed Detective Mayo that the victim had made a disclosure to the guidance counselor. Officer Turner also informed Detective Mayo that the victim had denied anything happened when she spoke with him and that "it was about a boy" but that "he felt there was something else going on." Detective Mayo testified that "it was understood that the reason [the victim] said that was because she was trying to deflect at the time because of what was really going on that she didn't want to talk about."

After Detective Mayo's testimony, the State rested and the Defendant moved for a judgment of acquittal, which the trial court denied. The Defendant presented testimony from Loren Batts, who was the owner of the home where the Defendant and his family lived in Nashville. Batts testified that, at the time, she was dating Stuart Levine, who was the Defendant's friend and co-worker.

Stuart Levine testified that he had known the Defendant for at least ten years and had lived with him in California. When Levine moved to Tennessee, he invited the Defendant to come work for him. Levine recalled that the Defendant treated the victim like his own daughter and that he seemed to treat her well. Levine testified that, on Sunday, January 13, 2013, he was at the Defendant's home to fix a leak in the roof. Levine recalled that the Defendant, the victim, and her younger sister were playing musical instruments together "just having a time." Levine also recalled that, the following Tuesday, he observed the victim hug the Defendant in the kitchen. The Defendant was arrested a few days later. Levine testified that he talked to the victim about the allegations she had made against the Defendant in California and that the victim told him "it was her mother's doing."

On cross-examination, Levine acknowledged that he did not testify about the events he saw in the Defendant's house when he testified at a prior juvenile court hearing involving the victim and the Defendant. Levine also confirmed that he did not tell the Defendant about the conversation he had with the victim discussing the prior abuse in California.

The Defendant testified that he was fifty-two years old and was born in the Czech Republic. The Defendant came to the United States in 1992 and is now a United States citizen. He met the victim's mother in the Czech Republic and she later moved to the United States with the victim and lived with the Defendant. The Defendant and the victim's mother were married in August 2001 and their daughter was born in June 2002.

- 6 -

The Defendant testified that they began having marital problems in 2006. Eventually, they decided it would be a good idea for the Defendant to move to Tennessee for work.

After the Defendant moved to Tennessee, the victim's mother stopped contacting him. He returned to California to meet with the victim's mother and was served with a restraining order alleging that he had fondled his stepdaughter, the victim. The Defendant denied inappropriately touching the victim, returned to Tennessee, and the restraining order was eventually lifted. The victim's mother informed the Defendant that she wanted a divorce, and they initiated divorce proceedings, which were never completed.

The Defendant testified that the victim's mother later contacted him about moving to Tennessee because they could no longer afford to live in California. The Defendant agreed and brought the victim's mother and her daughters to Tennessee. The Defendant and the victim's mother began having marital problems again after they were reunited in Tennessee. The Defendant proposed moving the family back to the Czech Republic but the victim's mother and the victim were not interested. By January 2013, the Defendant and the victim's mother were staying in separate rooms and again discussing the possibility of divorce.

The Defendant testified that, on January 12, 2013, he was speaking with the victim about the possibility that he and the victim's mother were going to get a divorce and informed her that he wanted custody of her younger sister. He stated that they also discussed the possibility of moving back to the Czech Republic, the victim's recent break-up with her boyfriend, and other topics, like the victim's college applications. The Defendant was arrested the following Friday. While the Defendant was in jail, the victim's mother filed for divorce. Based on the criminal charges, the Defendant testified he was not able to see his daughter. The Defendant denied raping or inappropriately touching the victim.

On cross-examination, the Defendant stated that he and the victim had a typical father-daughter relationship. The Defendant confirmed that, on January 12, 2013, he was talking to the victim in his bedroom. The Defendant also confirmed that he was sitting in a chair at his desk and that the victim hugged him after they finished their conversation. The Defendant also admitted to keeping a bottle of Absinthe liquor in his bedroom. The Defendant denied asking the victim about her sexual activities but agreed that he might have told her that if she was ever attacked or raped that she should not fight back.

The Defendant was aware of the victim's relationship with her boyfriend and agreed that he told the victim that he did not want her to date him and that her boyfriend

could not come to the house. The Defendant testified that the victim and her boyfriend broke up in early January 2013 and that it upset the victim.

Based on the above testimony, the jury returned a verdict of guilty for two counts of sexual battery by an authority figure and two counts of statutory rape by an authority figure. The jury could not reach a decision on the two rape charges, and the trial court declared a mistrial as to those counts.

**Sentencing Hearing.** On December 4, 2015, the trial court held a sentencing hearing. The State presented testimony from one witness, the victim.

The victim testified that she was physically and emotionally affected by the Defendant's actions. She was in counseling and suffered from nausea, insomnia, nightmares, panic attacks, and high cholesterol levels due to stress. She stated that she felt worthless and guilty for breaking her family apart and noted the additional stress on her mother as a single-parent. The victim testified that she suffers from flashbacks and has a hard time creating new relationships with people. She stated that she has anxiety around men and especially with men around kids.

Additionally, the victim testified that, with the Defendant incarcerated, she and her mother were financially burdened and that she had to attend a nearby college and take on a parental role with her younger sister. The victim stated that she wanted her younger sister to be safe and wanted the Defendant to be in jail or kept away from her younger sister until she turns eighteen.

The trial court found that enhancement factor (4), that a victim of the offense was particularly vulnerable because of age, applied because the victim was a minor and it had left her emotionally scarred. Accordingly, the trial court sentenced the Defendant to four years for each count as a Range I, Standard Offender. The trial court stated that three counts would run concurrently and that one count would run consecutively to the other three, resulting in an effective sentence of four years served followed by four years' probation. The trial court granted the State's request to retire counts five and six pending the outcome of the instant appeal.

On January 4, 2016, the Defendant filed an amended motion for new trial.[2] The trial court entered an order denying the motion on January 20, 2016, and the instant appeal followed.

---

[2] The exact date the Defendant's original motion for new trial was filed is unclear because the date stamp on the motion is illegible, although it is clear that it was filed in December 2015 and the certificate of service indicates that the motion was sent on December 3, 2015. Accordingly, the Defendant's motion for new trial was filed before the judgments of convictions and sentence were entered

**ANALYSIS**

On appeal, the Defendant argues that (1) the trial court erred in allowing inadmissible opinion, character, and hearsay testimony at trial; (2) the trial court erred in excluding evidence of the victim's motive to fabricate the allegations against the Defendant; (3) the trial court erred in allowing the victim to remain in the courtroom following her testimony;[3] (4) the trial court erred in denying the Defendant's motion for judgment of acquittal as to counts five and six; and (5) the Defendant's sentence was unlawful. After a thorough review of the record, we affirm the judgments of the trial court.

1. **Opinion, Character, and Hearsay Testimony.** The Defendant argues that the trial court erred in admitting opinion testimony from Detective Mayo, Officer Turner, and the State during closing arguments. The Defendant also argues that the trial court erred in admitting character and hearsay testimony from Gung and Officer Turner. The State responds that the testimony was properly admitted and that most of the Defendant's issues are waived due to the Defendant's failure to object at trial and include these issues in his amended motion for new trial. We agree with the State.

A. Opinion Testimony. The Defendant contends that two types of opinion testimony were wrongfully admitted at trial: lay opinion testimony, which the witness was not qualified to give, and opinion testimony regarding the truthfulness of the victim's allegations against the Defendant. The Defendant argues that this inadmissible opinion testimony was given at trial by Detective Mayo, Officer Turner, and the State.

First, the Defendant argues that Detective Mayo presented inappropriate testimony "about a topic that he was not qualified as an expert to provide." Specifically, the Defendant objects to two separate instances in which Detective Mayo opined that the victim was "deflecting" when she initially denied that anything was wrong to Officer Turner. The first instance was given during the defense's cross-examination of Detective Mayo:

---

on January 9, 2016 and furthermore, may have been filed before the sentencing hearing on December 4, 2016. Although the Defendant's motion for new trial was premature, we will nevertheless consider the issues raised in the amended motion for new trial because the State has not raised the issue on appeal and we discern no prejudice caused to the State. See State v. Siliski, 238 S.W.3d 338, 374 (Tenn. Crim. App. 2007) (citing State v. Perry Saleem Lee, No. 01C01-9806-CC-00266, 1999 WL 346196, at *5 (Tenn. Crim. App. June 2, 1999) (finding no prejudice to the State by defendant's premature motion for new trial and thus no reason that issues should not be addressed on appeal)).

[3] The Defendant also alleges as a separate issue that the errors in issues one through three were not harmless and that the cumulative effect of these errors warrants reversal. However, we have eliminated this as an issue on appeal because we discern no errors in the trial court's decisions.

| | |
|---|---|
| Defense counsel: | And would you agree with me that you never followed up with [the victim] as to what she meant or why she would have told Officer Turner that there was no rape, it was a boy thing? |
| Detective Mayo: | No. Because initially it was understood that the reason she said that was because she was trying to deflect at the time because of what was really going on that she didn't want to talk about. |

The defense did not object to this testimony. In fact, defense counsel continued on the same line of questioning, and concluded the cross-examination by asking him the following:

| | |
|---|---|
| Defense counsel: | Okay. But so you were willing to say to [the victim] "When you sent that text, you ju[s]t wanted to get something out, right?[,]"[] so we know you were willing to give that question to her, but you were not willing to say to [the victim] "You told Officer Turner that no rape happened, it was a boy thing, because you wanted to get something out; right?[,]"[] that you weren't willing to ask her that question, were you? |
| Detective Mayo: | No. I disagree with you. |
| Defense counsel: | Okay. Well, I know you do, but you didn't ask her that question, did you? |
| Detective Mayo: | Not for the reason you're alleging, no. |

Immediately after, on redirect, the State asked Detective Mayo why he did not ask the question posed by defense counsel above. Detective Mayo responded that "Like I said, it was pretty much very clear when we started looking into the matter that when [the victim] was approached by Officer Turner originally, it was a way to deflect." Defense counsel objected to this second mention of "deflection" on the basis that Officer Turner was not "qualified as a psychologist to start talking about deflection and those types of issues." The trial court sustained his objection, and noted that Officer Turner had already explained twice why he did not ask the victim the question.

Initially, we note that the Defendant arguably waived this issue regarding the first mention of "deflection" by Detective Mayo because he did not make a contemporaneous objection to the testimony at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). Likewise, the Defendant's reliance on his pretrial motion in limine to preserve a trial objection is insufficient, particularly considering that the trial court instructed the Defendant at the hearing on the motion in limine to object at trial if an issue arose so that the trial court could rule appropriately. Nevertheless, because the Defendant did object to the second instance of the "deflecting" testimony, we will review this issue.

The Defendant argues that the trial court erred in admitting the testimony because Detective Mayo was not qualified as an expert in the field of psychology. However, lay witnesses may testify to opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). This rule is not without its limitations:

> Generally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn. 1987). This rule preserves the province of the jury as the fact-finding body designated to draw such conclusions as the facts warrant. Id. An exception to this general rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, id. at 532, such as testimony that a footprint in snow looked like someone had slipped, National Life & Accident v. Follett, 168 Tenn. 647, 80 S.W.2d 92 (1935), or that a substance appeared to be blood. State v. Mabon, 648 S.W.2d 271, 274 (Tenn. Crim. App. 1982).

State v. Brown, 836 S.W.2d 530, 550 (Tenn. 1992).

It is well-established that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to

have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

We conclude that the trial court did not abuse its discretion in admitting Detective Mayo's statements. Detective Mayo's testimony was rationally based on his perception of the victim and was helpful to a clear understanding of his testimony, especially considering the confusing and repetitive line of questioning used by defense counsel, including the lengthy compound question which elicited Detective Mayo's first statement about "deflecting." Furthermore, rather than objecting to the testimony, defense counsel continued to question Detective Mayo about the issue. Accordingly, Detective Mayo was allowed to explain his answer. The Defendant is not entitled to relief.

Next, the Defendant argues that Officer Turner, on three separate occasions, provided inadmissible opinion testimony regarding the truth of the victim's allegations. First, the Defendant objects to two instances where Officer Turner testified that he "felt like something was wrong" when he first spoke with the victim. Third, the Defendant objects to Officer Turner's explanation of his job protocol that "If we feel like there's danger or something with the child then, yes, we go on to the next level." The State responds that these issues are waived because the Defendant failed to include any issue regarding Officer Turner's testimony in his amended motion for new trial. The State further asserts that the Defendant has failed to establish plain error.

Tennessee Rule of Appellate Procedure 3(e) states that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." The rule requires that issues presented in the motion for new trial be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court." Waters v. Coker, 229 S.W.3d 682, 689 (Tenn. 2007) (citing State v. Gauldin, 737 S.W.2d 795, 798 (Tenn. Crim. App. 1987)). "[A]ppellate courts should review a motion for new trial in the light most likely to preserve the issue alleged, although courts cannot create an error where none has been legitimately preserved." Fahey v. Eldridge, 46 S.W.3d 138, 146 (Tenn. 2001). The Tennessee Supreme Court explained:

> Before an issue can be properly preserved in a motion for new trial under Rule 3(e), a well-pleaded motion should (1) allege a sufficient factual basis for the error by setting forth the specific circumstances giving rise to the alleged error; and (2) allege a sufficient legal basis for the error by

identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

Id.

The Defendant acknowledges that he failed to include this issue in his amended motion for new trial but asserts that the issue is "ripe for plain error review." The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. We additionally note that "rarely will plain error review extend to an evidentiary issue." State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sep. 11, 2007).

Upon review of the record, we conclude that the Defendant has failed to establish all five factors required for plain error. Specifically, the Defendant failed to show that a clear and unequivocal law was breached, a substantial right was adversely affected, or that consideration of the error is necessary to do substantial justice. Rather, as the State points out, the Defendant's objections to Officer Turner's first two statements were sustained, so it is unclear what further relief the Defendant is seeking. Additionally, the Defendant did not object to the third statement at trial and has not demonstrated how Officer Turner's statements about protocol or why he pursued an investigation were inadmissible or prejudicial. The Defendant is not entitled to relief on this issue.

The Defendant also contends that the State improperly opined about the victim's credibility during closing arguments by referring to her demeanor on the witness stand and, specifically, by stating that, if the victim's emotions were not genuine "then she should get an academy award for her performance because that would be impressive to be able to manufacture emotion like that." Again, the Defendant failed to raise this issue in his amended motion for new trial and made no objection at trial. See Tenn. R. App. P.

- 13 -

3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived."); see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). The Defendant asserts that plain error review applies, but provides no argument addressing any of the factors permitting its application. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate reference to the record will be treated as waived in this court."). Accordingly, the issue is waived.

B. Character Testimony. Next, the Defendant argues that the State improperly presented testimony by school counselor April Gung regarding the victim's character traits that she was "reserved" and "never one to be attention seeking." This issue was also not included in the Defendant's amended motion for new trial and the Defendant made no specific allegation of plain error in this instance. Therefore, the issue is waived. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived.").

C. Hearsay. The Defendant next contends that the trial court incorrectly admitted four separate hearsay statements, one by Officer Turner and three by school counselor April Gung. However, the Defendant has waived the hearsay issue as to Officer Turner, since it was not included in his amended motion for new trial and he makes no claim of plain error. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived."). Accordingly, we will address only the three alleged hearsay statements by Gung which were properly preserved for appellate review.

The Defendant first objects to the following testimony given on direct examination:

State:  And were you -- Well, when [the victim] came in [your office], what was her demeanor?

Gung:  She was upset.  She was crying.  She disclosed some --

- 14 -

Defense counsel then interrupted and objected "to the content of the statement," and the State responded that the victim had already testified during her cross-examination that she had made a disclosure to Gung. The trial court held a bench conference out of the hearing of the jury. Defense counsel argued that, although the victim was allowed to testify as to what she told Gung, Gung's testimony did not qualify as a prior consistent statement and was cumulative. The State responded that the victim had been impeached by the defense with allegations that the victim was lying about the rape because she originally denied the rape occurred to Officer Turner. The trial court ruled that the testimony was admissible, and found that, "I mean we don't need to get into all of the sordid details, but she can certainly testify as to basically what [the victim] told her."

The State then proceeded with its questioning, and asked Gung if the victim made a disclosure to her. Gung responded that "[s]he did, yes." Defense counsel made no objection to this statement. Gung was then asked about the conversation where the disclosure was made and whether the victim "express[ed] concern about anything." Gung responded affirmatively and when the State inquired further, defense counsel objected to hearsay. The trial court allowed the question, and Gung testified that "[the victim] was concerned about how the things she was sharing with me would impact her family, particularly her sister."

In determining whether a statement is hearsay and, if so, whether it fits within one of the exceptions to hearsay, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule— are questions of law subject to de novo review." Kendrick, 454 S.W.3d at 479 (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

"[U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). However, before a prior consistent statement becomes admissible, "the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up." Id. at 433-34. "The impeaching attack on the witness's credibility need not be successful for admissibility of the prior consistent statement." State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15,

2006). "A prior consistent statement used to rehabilitate a witness is not hearsay as it is not offered for the truth of the matter asserted." Id. (citing Tenn. R. Evid. 801(c)).

The State argues that the statements were admissible as prior consistent statements because the Defendant "had attacked the victim's testimony as a deliberate falsehood." On cross-examination, the defense certainly implied that the victim made up the allegations against the Defendant. Defense counsel implied that the victim made up the allegations because she was upset that the Defendant prevented her from seeing her boyfriend, that the victim's mother actually forced her to make the allegations, and that she was fabricating the allegations for attention from other boys. On the morning of trial, defense counsel repeatedly and explicitly told the trial court that he intended to "accuse [the victim] of lying in this case." The foregoing evidence questioned whether the victim was actually raped. As a result, the State was permitted to ask the school counselor about the victim's prior statements. These statements were consistent with the victim's testimony on direct examination. The trial court did not abuse its discretion by admitting Gung's testimony.

**2. Motive Evidence.** The Defendant next argues that the trial court erred in excluding evidence of the victim's motive to fabricate the allegations against him, specifically, evidence of the dismissal of a petition in juvenile court and evidence of the victim's prior sexual acts. The State responds that the trial court properly excluded the evidence and that the Defendant's argument regarding the victim's prior sexual acts is waived.

A. Dismissal of Juvenile Court Petition. First, the Defendant contends that his "right to a fair trial and due process were denied when he was denied the right to present evidence of the accuser[']s motive to fabricate the accusation." Specifically, the Defendant asserts that "the dismissal of the dependent neglect petition in juvenile court was motive for the [a]ccuser to continue with the allegations in criminal court as an alternate way to deny [the Defendant] parental rights to his daughter."

Before trial, the Defendant filed a motion requesting the admission of a juvenile court order dismissing a dependent neglect petition filed by the State against the Defendant. The Defendant argued that the petition "sought to declare the Defendant's biological daughter to be a dependent neglected child and to prevent his contact with her." The Defendant also argued that the juvenile case "was based upon the same facts or incidents as alleged in the criminal indictment." The trial court denied the Defendant's motion, but made no findings of fact or law.

The Defendant cites State v. Brown as support for his claim that his right to present a defense was violated. 29 S.W.3d 427 (Tenn. 2000). Brown outlined factors to

consider in determining "whether the constitutional right to present a defense has been violated by the exclusion of evidence." Id. at 433. Pursuant to Brown, "the analysis should consider whether (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34 (citing Chambers v. Mississippi, 410 U.S. 284, 298-301) (1973)) (footnote omitted). The Defendant claims that the dismissal of the juvenile petition provided critical motive evidence because it "would have absolutely proven" that the victim's allegations were being used to prevent the Defendant from obtaining custody or visitation rights with his daughter.

However, the mere dismissal of a petition in juvenile court had little, if any probative value on this issue, and the exclusion did not undermine any elements of the Defendant's defense. The Defendant testified about the juvenile court case and his divorce and custody issues and was able to present a defense despite the exclusion. In fact, the Defendant acknowledges in his brief that he was "able to provide corroborative evidence through other witnesses that the marriage was troubled" and that the Defendant testified "that his wife was using the criminal allegations to inhibit custody and even visitation of his minor daughter."

Additionally, the interests supporting exclusion of the evidence were substantially important. As the State points out, the juvenile court proceeding was a civil proceeding and had a different burden of proof. Therefore, the juvenile court dismissal is not relevant to the instant case. The Defendant's right to present a defense was not violated by the trial court's ruling on the motion to admit the juvenile court evidence. The Defendant's claim is without merit.

B. 412 Motion. The Defendant also argues that the trial court "erred in denying evidence of the [a]ccuser's sexual relationship with a peer." Again, it appears this issue was waived because it was not included in the Defendant's amended motion for new trial. The only similar issue in the Defendant's amended motion for new trial was that "[t]he court erred in failing to grant or at least conduct an evidentiary hearing on the Defendant's Rule 412 Motion," which requested the admission of evidence regarding "[t]he alleged victim[']s sexual activity with her boyfriend who was at the time of the offense a peer and the approximate same age of the [seventeen][-]year[-]old alleged victim." The trial court ultimately denied the Rule 412 motion, finding that the Defendant failed to show how the victim's sexual behavior with her ex-boyfriend was relevant to the instant case.

Although the Defendant's issue statement and amended motion for new trial address evidence of the victim's sexual relationship with her ex-boyfriend, the Defendant actually argues an entirely different issue in his brief. In fact, the Defendant explicitly

concedes in his brief that the trial court's denial of his Rule 412 motion was "fair enough on this issue." Instead, on appeal, the Defendant argues that the State opened the door to Rule 412 evidence at trial and that he "should have been allowed to testify that he did have conversations with [the victim] about her sexual activity," not that the victim had a sexual relationship with a peer. Although both issues include Rule 412, they are not the same, and the Defendant's argument risks waiver of these issues. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived."); see also Waters, 229 S.W.3d at 689 (noting that issues presented in the motion for new trial must be "specified with reasonable certainty so as to enable appellate courts to ascertain whether the issue was first presented for correction in the trial court."). However, because the record does show that defense counsel raised an issue at trial regarding the Defendant's testimony about the victim's sexual activity, we will consider the merits of the Defendant's argument.

The Defendant references the following testimony at trial:

State: And did [the Defendant] ever have conversations with you about sexual activities in general?

The victim: Yes.

State: And what kinds of conversations would that be? What kinds of things would he say and ask?

The victim: He would ask about how far I had gone with anyone I was, anyone I had a crush on, anyone I was thinking of dating. He --

Defense counsel then objected, and a bench conference outside the hearing of the jury was held. Defense counsel argued that the State had opened the door to Rule 412 evidence. The trial court held that, "If you ask questions about those kinds of things, I think it does open that door. So, it's something which you really need to kind of stay away from." When the direct examination resumed, the State did not ask any other questions about the victim's sexual behavior. After the State rested but before the Defendant presented his case, defense counsel informed the trial court that he planned to ask the Defendant the same question asked of the victim previously, regarding whether the Defendant asked the victim about her sexual activities. The trial court agreed that it was a fair question, but instructed defense counsel not to ask about the content of those discussions or any other details about the victim's sexual activities.

- 18 -

The Defendant's allegation that he was not allowed to testify that he had conversations with his stepdaughter about her sexual activity are without merit. In actuality, defense counsel asked the Defendant this exact question on direct examination:

> Defense counsel: Mr. Pompa, did you ever ask [the victim] about her sexual activities, if any?
>
> The Defendant: No.

Accordingly, it is not clear what relief the Defendant is seeking in relation to this testimony. Additionally, we agree with the trial court that any evidence regarding the victim's sexual relationship with her ex-boyfriend would be irrelevant, and the Defendant has not proven otherwise.

The Defendant also appears to argue that the evidence should have been allowed because Rule 412 does not apply to the offense of statutory rape by an authority figure. However, this issue is clearly waived because the Defendant did not raise this issue at any point during trial or in his amended motion for new trial. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise, such issues will be treated as waived."); see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant is not entitled to relief.

**3. Victim in Courtroom.** Next, the Defendant contends that "he did not receive a fair trial because the alleged [v]ictim was allowed to remain in the courtroom after her testimony while crying and emotional." The Defendant points to only one instance that occurred during the trial, when defense counsel objected to the victim crying during the election of offenses. The trial court ruled that the victim could remain in the courtroom.

The Defendant cites no legal authority in support of this argument in his brief and therefore, has not demonstrated how he was prejudiced by the victim's crying. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor[e], including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue.

State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (citing State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987)). Consequently, the issue is waived.

**4. Motion for Judgment of Acquittal.** Next, the Defendant contends that the trial court erred in denying his motion for judgment of acquittal as to counts five and six, which charged the Defendant with rape. The jury deadlocked and a mistrial was declared on these two counts, and the State retired both charges pending the outcome of the instant appeal. Specifically, the Defendant argues that there was insufficient evidence to support the charges because the victim never expressed a lack of consent.

Tennessee Rule of Criminal Procedure 29 provides, in pertinent part:

> On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). When considering a motion for judgment of acquittal, whether at the close of the State's proof or after the conclusion of all proof at trial, the trial court is only concerned with the legal sufficiency of the evidence and not with the weight of the evidence. State v. Collier, 411 S.W.3d 886, 892 (Tenn. 2013) (citing State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). "This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence." State v. James, 315 S.W.3d 440, 455 (Tenn. 2010) (citing Overturf v. State, 571 S.W.2d 837, 839 & n.2 (Tenn. 1978)). If a defendant chooses to present proof after the trial court denies the motion for judgment of acquittal made at the close of the State's case-in-chief, then he "waive[s] any claim of error for failure to grant the motion for judgment of acquittal at the conclusion of the proof offered by the State." Collier, 411 S.W.3d at 893. However, if the defendant renews his motion for judgment of acquittal at the conclusion of all the evidence, he does not "waive his right to appeal the denial of the motion made at the close of all of the proof or to challenge the sufficiency of the convicting evidence." Id.

As an initial matter, we note there are issues of waiver involved yet again. At the close of the State's proof, defense counsel moved for a judgment of acquittal for counts five and six on the basis that the victim never verbally expressed a lack of consent to the Defendant's actions. Defense counsel argued that the Defendant did not have "reason to know there was a lack of consent on the intercourse" because the victim did not say

- 20 -

anything after he touched her breasts. The State responded that Tennessee law does not require "a verbal no" and that "silence is not consent." Furthermore, the State noted that there were no other actions by the victim that indicated she gave consent in this case. The trial court ruled that a jury question was raised "with respect to all counts" and denied the motion for judgment of acquittal. After the court made this ruling, the defense presented its case-in-chief. However, the record reflects that defense counsel did not renew his motion for judgment of acquittal at any time after conclusion of the evidence.

As stated previously, when a defendant chooses to present proof after the trial court denies the motion for judgment of acquittal made at the close of the State's case-in-chief, he "waive[s] any claim of error for failure to grant the motion for judgment of acquittal at the conclusion of the proof offered by the State." Collier, 411 S.W.3d at 893. Because the Defendant did not adequately renew his motion for judgment of acquittal regarding counts five and six after presenting evidence, we conclude that the issue is waived.

However, because the "the standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," we will review the defendant's claim as a sufficiency of the evidence challenge. State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Accordingly, we must consider "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In applying this standard of review, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court shall not substitute its inferences for those drawn by the trier of fact. Dorantes, 331 S.W.3d at 379 (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010); Liakas v. State, 286 S.W.2d 856, 859 (1956)).

The Defendant challenges the evidence supporting counts five and six of the indictment, which charged him with rape. In order to sustain a conviction of rape, the State was required to prove beyond a reasonable doubt the unlawful penetration of the

victim by the defendant, or of the defendant by the victim, if the defendant knew or had reason to know that the victim did not consent to the penetration, or if the penetration was accomplished through the use of force or coercion. T.C.A. § 39-13-503. Sexual penetration is defined in relevant part as "cunnilingus, fellatio . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's[.]" Id. § 39-13-501(7). Viewed in the light most favorable to the State, the evidence showed that the victim and the Defendant were having a conversation in the Defendant's bedroom when he placed his hand on the victim's breast. The Defendant then locked the door, removed the victim's clothing, and laid her on his bed. The Defendant inserted his tongue into the victim's vagina and put one or two fingers into her anus. When the Defendant moved to kiss the victim, she jumped out of the bed, got dressed, and ran out of the room. The Defendant followed the victim into the bathroom and asked if she was going to report him. The victim testified that she never consented to the Defendant's actions.

The fact that the victim's testimony was refuted by the Defendant does not preclude a rape conviction. The Tennessee Supreme Court has held that "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape." Collier, 411 S.W.3d at 899. Moreover, this court has held that "a showing of lack of consent by the victim is sufficient to sustain a rape conviction," and that "[n]on-resistance is not consent." State v. Wade Henry Allen Marsh, No. E1998-00057-CCA-R3-CD, 2000 WL 555231, at *3 (Tenn. Crim. App. May 8, 2000). Additionally, "[t]he issue of consent is a question for the jury." Id. (citing Haynes v. State, 540 S.W.2d 277, 278 (Tenn. Crim. App. 1976)). The evidence is not insufficient as a matter of law to support a conviction for rape.

**5. Sentencing.** Finally, the Defendant argues that he should have received less than four years for each conviction, that the trial court erred by improperly applying an enhancement factor, that the trial court should have applied three mitigating factors, and that the trial court erred by imposing partially consecutive sentences.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. "If, however, the trial court applies inappropriate mitigating

and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008).

Upon imposing a sentence, a trial court must consider the following: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in § 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b)(1)-(7) (2016). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C) and 40-35-103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

As to the length of his sentence, the Defendant argues that the trial court failed to consider three mitigating factors, namely, that his conduct did not cause or threaten serious bodily harm, that he committed the offense under unusual circumstances so that it is unlikely that a sustained intent to violate the law motivated his conduct, and that the victim was almost eighteen years old and "was certainly intelligent and independent enough to form actual consent if not legal consent." He also argues that the trial court incorrectly applied enhancement factor (4) because the victim was not vulnerable since she was almost eighteen years old. Our review of the record supports the trial court's sentence in this case.

As an initial matter, the Defendant was a Range I, Standard Offender and subject to a sentencing range of three to six years for the offenses of sexual battery by an authority figure and statutory rape by an authority figure, both Class C felonies. See T.C.A. § 39-13-527(b); id. § 39-13-532(b) (2006); id. § 40-35-112(a)(3). Thus, the trial court's four-year sentences were within the applicable statutory range and presumed reasonable.

In determining the appropriate length of the Defendant's sentence, the trial court applied enhancement factor (4), that "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability." See T.C.A. § 40-35-114(4). The trial court found that the victim "was particularly vulnerable because of her age" and that she had been emotionally scarred, noting the victim's earlier testimony at the sentencing

- 23 -

hearing. Although the trial court erroneously applied enhancement factor (4) to the Defendant's sentence, see State v. Adams, 864 S.W.2d 31 (Tenn. 1993) (noting that the trial court could not rely on factor (4) to enhance defendant's aggravated sexual battery conviction where no particular vulnerability was shown and age was an essential element of offense), the four-year sentences imposed by the trial court in this case are supported by the record and consistent with the purposes and principles of sentencing. See Bise, 380 S.W.3d at 706 (noting that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act). Moreover, the Defendant's argument that the trial court failed to consider any mitigating factors is also without merit because the record reflects that the mitigating factors were argued to the trial court at sentencing.

Additionally, we note that the Defendant also argues that he is entitled to a "presumptive sentence" of three years for statutory rape. However, "presumptive sentences" were eliminated by the 2005 Amendments to the Sentencing Act. Bise, 380 S.W.3d at 700-01. Instead, the post-2005 version of the Act allows trial courts the discretion "to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d) (2010)). The record amply supports the four-year sentences imposed by the trial court. The Defendant is not entitled to relief.

Next, the Defendant argues that the trial court erred in imposing partial consecutive sentences. The Defendant argues that four years to serve followed by four years' probation "is not reasonably related to the severity of the offense involved."

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in Tennessee Code Annotated section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).  An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense."  Id. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).  In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed."  T.C.A. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.  This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)."  Pollard, 432 S.W.3d at 861.

In the instant case, the trial court imposed consecutive sentences based on its finding that "it is necessary to protect the public against further criminal conduct by the defendant, and the consecutive sentence reasonably relates to the seriousness of the offenses committed."  It appears that the trial court was relying on section 40-35-115(b)(4), although we acknowledge that the record contains limited findings by the trial court.  Nevertheless, the record supports the imposition of consecutive sentences.  Under section 40-35-115(b)(5), the Defendant was convicted of four statutory offenses involving sexual abuse of his minor stepdaughter.  Additionally, the aggravating circumstances surrounding these convictions clearly warrant consecutive sentencing.  The victim testified at length about the physical and mental damage she suffered as a result of

the Defendant's actions, and the trial court found that the victim was emotionally scarred based on this testimony. Because the Defendant's convictions satisfy at least one of the categories set forth in section 40-35-115(b), we affirm the imposition of a consecutive sentence by the trial court.

Lastly, although not raised by either party, we must note that the trial court incorrectly sentenced the Defendant to probation for statutory rape by an authority figure, which is a non-probable offense. At the sentencing hearing, the trial court determined that "[Counts] [o]ne, [t]wo, and [t]hree will be concurrent, but [c]ount [f]our will be consecutive. Four years to serve, followed by four years['] probation." Counts one and two of the Defendant's indictment charged him with sexual battery by an authority figure and counts three and four charged him with statutory rape by an authority figure. Accordingly, this resulted in a sentence of probation for one of the Defendant's convictions of statutory rape by an authority figure, which is not eligible for probation. See T.C.A. § 39-13-532(b) (2006) ("No person who is found guilty of or pleads guilty to the offense [of statutory rape by an authority figure] shall be eligible for probation pursuant to § 40-35-303 or judicial diversion pursuant to § 40-35-313.").

However, it appears that the trial court corrected this mistake after the sentencing hearing by entering corrected judgment forms to reflect that the sexual battery conviction received probation instead of the statutory rape conviction. The judgment forms reflect that the Defendant received probation for count one, to run consecutive to counts two, three, and four. The judgment forms also reflect that counts two through four are to run concurrently.

Generally, where there is a conflict between a judgment form and the transcript of the proceedings, the transcript controls. See State v. Brown, 479 S.W.3d 200, 213 (Tenn. 2015) (citing State v. Moore, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991)). However, in this case, the trial court's imposition of probation for a strictly non-probable offense was in direct contravention of Tennessee Code Annotated section 39-13-532(b) (2006). As such, the trial court's sentence, as pronounced at the sentencing hearing, was illegal. See Brown, 479 S.W.3d at 208 (noting that illegal sentences include those "which are 'not authorized under the applicable statutory scheme.'"). Nevertheless, a trial court may alter a final judgment in order to correct an "illegal, as opposed to a merely erroneous, sentence at any time, even if it has become final." Id. at 206 (citing State v. Burkhart, 566 S.W.2d 871, 873 (Tenn. 1978)). Therefore, the trial court properly corrected the illegal sentence with the judgment form by re-assigning the consecutive probation sentence from the statutory rape conviction to the sexual battery conviction.

## CONCLUSION

- 26 -

Upon review of the record and applicable law, we affirm the judgments of the Davidson County Criminal Court.

_____
CAMILLE R. McMULLEN, JUDGE